In re the Marriage of Kathy Lynn
HAEFELE, petitioner,
Appellant,

v.

Douglas Alan HAEFELE, Respondent.

No. A11–1225.

Court of Appeals of Minnesota.

May 7, 2012.

Alan C. Eidsness, Melissa J. Nilsson, Henson & Efron, P.A., Minneapolis, MN, for appellant.

Kay Nord Hunt, Diane M. Odeen, Lommen, Abdo, Cole, King & Stageberg, P.A., Minneapolis, MN, and Vija L. Brookshire, Messerli & Kramer, P.A., Minneapolis, MN, for respondent.

Considered and decided by ROSS, Presiding Judge; HUDSON, Judge; and HALBROOKS, Judge.

## OPINION

ROSS, Judge.

Douglas Haefele moved the district court to modify child support he paid to his former spouse, Kathy Haefele, to align his obligation with the 2007 amendments to Minnesota's child-support law. When the district court calculated Kathy's gross income, it included certain distributions made to her as a shareholder by Dura–Supreme, a Subchapter S corporation. We hold that distributions made by an S corporation to a shareholder specifically for the shareholder to serve as a conduit to relay the funds to another business entity for the corporation's legitimate business purposes are not the shareholder's income for calculating child support. Similarly, distributions from an S corporation to a shareholder solely for the shareholder to pay her share of the corporation's tax liability on retained earnings are ordinary and necessary business expenses rather than the shareholder's income for calculating child support. We therefore reverse the district court's order, and we remand for a recalculation of child support.

## FACTS

Douglas and Kathy Haefele were married in November 1990 and had three children before they divorced in December 2000. Under the terms of a marital termination agreement, Kathy was granted sole physical custody of the children, with parenting time for Douglas. To determine child support under the arrangement, the parties assumed Douglas had a gross annual income of $108,000 plus bonuses. Kathy was not employed but received distributions from her interest in two nonmarital assets; she owned 20% of Dura–Supreme, Inc. and 33 1/3% of Howard Lake Properties, LLC. The termination agreement estimated Kathy's distributions in excess of the amount she would pay for the businesses' taxes to be $48,000 yearly. The district court incorporated these calculations from the termination agreement into its judgment and ordered Douglas to pay $1,794 in monthly child support, plus a portion of any bonus received.

In September 2010 Douglas filed a motion to modify his child support obligation. The parties agreed that his request was warranted due to the 2007 amendments to Minnesota's child-support law with its new guidelines. Before 2007, child support was calculated based on a percentage of the obligor's net income. *See* Minn.Stat. §§ 518.551, subd. 5(b), 518.54, subd. 8 (2004). This changed with the child support guidelines effective January 2007, which adopted an "income shares" approach to calculating child support based on the gross income of both parents. 2005 Minn. Laws ch. 164, §§ 26; 29 at 1920–24, *amended by* 2005 Minn. Laws 1st Spec. Sess. Ch. 7, § 28, at 3092–93; *see also Rose v. Rose,* 765 N.W.2d 142, 147 (Minn. App.2009). The parties also agreed that Douglas's gross annual income had climbed to $178,056, or $14,838 per month, and that he paid the children's medical and dental insurance at monthly costs of $341 and $98, respectively. His parenting time with the children varied from 10% to 45%.

The chief dispute in the district court and in this appeal is what comprises Ka-

thy's gross income. She owns part of three businesses. She still owns 20% of Dura–Supreme—the Subchapter S corporation—along with her brothers Kevin Stotts (20% owner) and Keith Stotts (60% owner). Keith Stotts, the president of Dura–Supreme, controls the day-to-day operations, including the decision whether to make shareholder distributions. Kathy also retains her one-third interest in Howard Lake Properties, which she owns equally with her two brothers. The focus of this dispute is another family-owned entity, TK Investments, LLC. TK Investments was formed in 2009 with ownership interests shared equally among Kathy, Kevin Stotts, and Keith Stotts, but Keith alone has the control rights.

The purpose and function of TK Investments distinguishes it from Kathy's other holdings. TK Investments originated when Keith Stotts and Dura–Supreme Chief Financial Officer Gene Schweiss made plans for Dura–Supreme to expand. To grow, the company needed more funding than it could secure from conventional sources. For example, it obtained a $3 million line of credit, but this was not sufficient for Dura–Supreme's growth plan. So it explored other options for funding. It began reducing costs, increasing collections, and deferring equipment purchases and facility expansion. This resulted in Dura–Supreme's accumulating significant cash reserves. This fit the growth plan but also exposed the company to risk from potential but unknown liabilities. The company's legal counsel and accountant suggested that it transfer the cash reserves to another entity to reduce exposure to this risk. TK Investments was the brainchild, created to serve as a lending entity to Dura–Supreme. Dura–Supreme cash reserves would reach TK Investments by way of pass-through distributions to Dura–Supreme's three shareholders, who would receive the funds in

specific amounts and transfer them to TK Investments. The three Dura–Supreme shareholders agreed to this arrangement and followed it.

The disagreement between the parties at the child-support modification hearing was how to treat two types of pass-through distributions received by Kathy—distributions from Dura–Supreme that she relayed to TK Investments for the purpose just described and distributions from Dura–Supreme that she applied to pay her tax liability on her proportionate share of Dura–Supreme's retained earnings. For four years Dura–Supreme made significant distributions to Kathy: $885,300 in 2007, $2,647,000 in 2008, $1,417,149 in 2009, and $1,294,200 in 2010. Kathy transferred a specified portion of this money to TK Investments initially indirectly through the Stotts Family Revocable Trust and then later directly. In 2008 she transferred $1,600,00 from the revocable trust to TK Investments. In 2009 she transferred $1,090,000 of her Dura–Supreme distributions to TK Investments. Portions of her distributions were also used to pay her share of tax liabilities that resulted from Dura–Supreme's operations: $777,800 in 2007, $567,500 in 2008, and $254,650 in 2009.

Douglas argued to the district court that all of Kathy's distributions should be included as her gross income for child support purposes. Kathy argued that the Dura–Supreme expansion model and the TK Investments structure alone precipitated the excess growth-oriented distributions from 2007 to 2009. She did not spend the funds to reduce her own expenses and the funds otherwise would have been retained by Dura–Supreme with no appearance of income to Kathy. She argued that most of the distributions should therefore be classified as Dura–Supreme's retained earnings that flowed through her

as a mere conduit to TK Investments. She argued similarly that the tax distributions from Dura–Supreme that were made to her only to pay her portion of the shareholder tax liability for the earnings that Dura–Supreme did retain also should be excluded from the gross-income calculation.

The district court relied on the "widely encompassing" definition of gross income found in Minnesota Statutes section 518A.29(a) (2010) and held that the definition undoubtedly included all the distributions from Dura–Supreme. It noted that the distributions from Dura–Supreme were income because they were taxed as such. The district court observed that the Member Control Agreement that governs TK Investments does not provide a continuing obligation for Kathy to contribute capital. So it found that she was not legally obligated to transfer the distribution money to TK Investments. It reasoned that the fact that Kathy chose to use the distributions to build up cash reserves for Dura–Supreme did not change the character of the funds from income to non-income for the purposes of determining child support.

The district court recognized that Kathy was not attempting to hide money to bolster her child-support claims and that the reason she transferred the funds to TK Investments appeared legitimate. It concluded nonetheless that the distributions were gross income in the form of periodic payments to Kathy. *See* Minn.Stat. § 518A.29. Similarly, it found that the tax distributions were also income to Kathy because the definition of gross income in section 518A.29 includes pre-tax income.

Based on the distributions averaged over a three-year period from 2007 to 2009, the district court found that Kathy's gross annual income was $1,679,380 and her gross monthly income was $139,948.

The district court calculated child support accordingly, finding that Douglas's child-support obligation to Kathy was reduced to $281 monthly and Kathy's medical support obligation to Douglas was $395 monthly.

Kathy Haefele appeals.

## ISSUES

I. Did the district court abuse its discretion by including the pass-through distributions from Dura–Supreme to TK Investments in the calculation of the conduit spouse's gross income?

II. Did the district court abuse its discretion when it included the S corporation distributions for proportionate tax payments to the shareholding spouse in the calculation of her gross income?

## ANALYSIS

Kathy Haefele's appeal challenges the modification of the child-support order. The district court has broad discretion in modifying child-support orders. *Gully v. Gully,* 599 N.W.2d 814, 820 (Minn.1999). A district court abuses this discretion by making a clearly erroneous conclusion against the facts on the record or by misapplying the law. *Id.; Ver Kuilen v. Ver Kuilen,* 578 N.W.2d 790, 792 (Minn.App. 1998).

### I

■ We believe that the district court erred as a matter of law when it held that the Dura–Supreme earnings distributed to Kathy to be transferred to TK Investments were gross income for calculating child support. Whether a source of funds is income is a legal question we review de novo. *Sherburne Cnty. Soc. Servs. ex. rel. Schafer v. Riedle,* 481 N.W.2d 111, 112 (Minn.App.1992). For child support pur-

poses, gross income is "any form of periodic payment" to a party. Minn.Stat. § 518A.29(a).

Dura–Supreme is a Subchapter S corporation, and, as such, its earnings or losses pass through to its shareholders and are reported by the shareholders on their individual tax returns in proportion to their ownership interest. *See Hubbard Cnty. Health and Human Servs. v. Zacher*, 742 N.W.2d 223, 225 (Minn.App.2007). The shareholders pay taxes on the income of the S corporation, even though the income itself belongs to the corporation. *See* I.R.C. §§ 1363, 1366–68 (2010). The corporation's majority shareholder decides whether any income is distributed or retained as earnings. *See Zacher*, 742 N.W.2d at 226. Retained earnings are a corporation's accumulated income that it retains as a corporate asset rather than distributes to its shareholders. *Gottsacker v. Gottsacker*, 664 N.W.2d 848, 850 (Minn. 2003).

■ Whether an S corporation's pass-through distributions in the nature of retained earnings given to a shareholder and then transferred to another entity are income for child support purposes is a close question of first impression in Minnesota. But the reasoning of *Zacher* informs our understanding that corporate motive is a key factor. In *Zacher*, the child-support obligor was employed by an S corporation owned by himself, his brother, and his father. 742 N.W.2d at 225–26. The obligor was a minority shareholder who had no authority to force a distribution of the company's earnings. *Id.* at 226. Instead, his father, the majority shareholder, decided whether the company would make distributions. *Id.* We reasoned that the motive behind the decision not to make distributions should control how to classify the corporation's undistributed earnings:

[T]he primary question that a district court must resolve in deciding whether the undistributed earnings of a Subchapter S corporation are income to a minority shareholder who is a child-support obligor is whether the corporation retained the earnings for a business reason or retained them to enable the obligor to 'shield income' or 'manipulate' the amount of money he receives in order to reduce or avoid his child-support obligation.

*Id.* at 227.

The reasoning in *Zacher* seems fitting here. The question is essentially the same and the legitimacy of the corporate purpose for the distribution decision is discernable. As minority shareholder in Dura–Supreme, Kathy lacks authority to make distributions or to retain earnings. She has not been substantially involved in Dura–Supreme's operations. The district court found that the pass-through distributions from Dura–Supreme to Kathy were made for what appeared to be legitimate business reasons and that she did not agree to the arrangement in order to hide money or to influence the child-support decision. The findings are supported and unchallenged. Although the funds were actually distributed to Kathy to deliver to TK Investments (in contrast to *Zacher* where the money stayed with the corporation), they were similarly in the nature of retained corporate earnings.

■ The district court was persuaded that the distributions that Kathy redirected to TK Investments should be included as her gross income in part because it determined that Kathy could control what happened to the distributions after she received them. It is true that Kathy may have been able, as a practical and temporary matter, to retain for herself the massive distributions without transferring them to TK Investments as she had prom-

ised the other two shareholders she would do. But this ability, if acted on, would likely have been illusory at best and made Kathy immediately liable to repay the corporation since "it is well established that shareholders in a close corporation owe a fiduciary duty to one another." *Berreman v. West Publ'g Co.*, 615 N.W.2d 362, 370 (Minn.App.2000), *review denied* (Minn. Sept. 26, 2000). On this record, it is impossible to imagine Kathy having any equitable right to keep the $2.7 million that she promised to deliver to TK Investments for the corporation, because that duty is "one of utmost good faith and loyalty." *Id.* (quotation omitted); *see also Pedro v. Pedro,* 489 N.W.2d 798, 801 (Minn.App.1992) ("The relationship among shareholders in closely held corporations is analogous to that of partners."), *review denied* (Minn. Oct. 20, 1992); *Evans v. Blesi,* 345 N.W.2d 775, 779 (Minn.App.1984) ("[A] fiduciary duty [includes] deal[ing] openly, honestly and fairly with other shareholders"), *review denied* (Minn. June 12, 1984).

For these reasons we cannot accept the district court's hypothesis; Kathy's only certain use of the funds was to deposit them as she promised (or, likely, to apply them to defend the inevitable miscellaneous allegations of promissory estoppel, unjust enrichment, misrepresentation, and other legal and equitable claims that may have been available to the shareholders whom she would have defrauded by her reneging). Our analysis is driven by the actual purpose of the distribution rather than Kathy's hypothetical opportunity to temporarily pocket it. The distributions were for a specific business use and Kathy's only exerted control over the money was to transfer to TK Investments all of it that she promised consistent with that use. Her part as to the distributed funds was only to follow through with her committed role in the corporation's decision to move some of its retained earnings to TK In-

vestments. We are not asked to consider the propriety of that arrangement or its treatment as a matter of tax law, and the parties do not contest it. We hold only that to the extent that Dura–Supreme's distributions for Kathy's transfer to TK Investments fits Dura–Supreme's business purposes, they are not Kathy's income for child-support purposes.

## II

■ We reach a similar result concerning the distributions Kathy received from Dura–Supreme to cover income taxes on the company's retained earnings—that is, on the earnings by Dura–Supreme that were not paid out for Kathy to retain or distributed for transfer to TK Investments. The parties do not dispute that a portion of the distributions that Dura–Supreme made to Kathy was solely to pay for its tax liabilities, and that she applied the money for that purpose.

When setting child support, the district court is directed specifically to "determine the gross income of each parent under section 518A.29." Minn.Stat. § 518A.34(b)(1) (2010). Under section 518A.29(a), a parent's "gross income" includes in relevant part "self-employment income under section 518A.30." And Minnesota Statutes section 518A.30 (2010) governs calculation of "income from self-employment or operation of a business, including joint ownership of a . . . closely held corporation." Dura–Supreme is a closely held corporation, and so Kathy's participation in the operation of that business constitutes her participation in "self-employment or operation of a business" that is a "closely held corporation." The provisions of section 518A.30 therefore apply to the income she derives from Dura–Supreme.

Under section 518A.30, "income from self-employment or operation of a business ... is defined as gross receipts minus costs of goods sold minus ordinary and necessary expenses required for self-employment or business operation." The parties have not put the "gross receipts" or "cost of goods sold" components of the statutory calculation at issue, and our question now is only whether to treat as her income the portions of the distributions that Kathy received from Dura–Supreme simply to allow her to pay the tax liability generated by her proportionate share of Dura–Supreme's retained earnings. Section 518A.30 excludes from income "ordinary and necessary expenses required for self-employment or business operation." And because section 518A.29 defines "gross income" to include "self-employment income under section 518A.30," the self-employment-income component of Kathy's "gross income" would also exclude those expenses.

Describing the tax mechanism for S corporations, like Dura–Supreme, the district court accurately explained that

> income taxes are assessed to the shareholders on the entire amount of income earned by the corporation (in an amount proportionate to each shareholder's ownership interest); it is completely irrelevant to this determination whether the income is retained or distributed. Thus, it is possible for S corporation shareholders to be taxed on income they have never received.

See also I.R.C. §§ 1363, 1366–68 (directing the individual shareholders, rather than the corporation, to pay the taxes on the corporate income retained). So the taxes assessed to Kathy for the share of Dura–Supreme's income attributed to her is based on tax liability generated by the business rather than by her. And because tax expenses are both ordinary and neces-

sary expenses for operating a business, the portion of Kathy's distributions that Dura–Supreme made to cover her taxes on her share of Dura–Supreme's retained income is an ordinary and necessary expense required for her "self-employment or operation of a business."

Our conclusion is consistent with a related facet of the statute. For child support purposes, "reimbursements or in-kind payments received by a parent in the course of employment, self-employment, or operation of a business shall be counted as income *if they reduce personal living expenses.*" Minn.Stat. § 518A.29(c) (emphasis added). Reimbursing or paying an S corporation's shareholder for the tax liability associated with that shareholder's share of corporate income for taxation purposes does not reduce the shareholder's "personal living expenses." Specifically here, without dispute, the portion of the distribution to Kathy for her payment of taxes on Dura–Supreme's retained income did not reduce her living expenses.

We also observe that in applying the statute as we have, shareholders of S corporations and traditional corporations are not dissimilarly treated for child support purposes. Treating the pure tax distribution as belonging to the S corporation rather than to the tax-conduit shareholder matches the statutory treatment of traditional corporate shareholders. If Dura–Supreme were a conventional corporation retaining its earnings, for example, it would have paid its own taxes on the earnings without passing the tax duty and the funds to pay it onto its shareholders. Our application of the statute renders the difference in corporate organization child-support neutral, and this result seems to be in keeping with the child-support statute, which nowhere suggests that the legislature intended that S corporation shareholders would be treated materially

differently from traditional corporation shareholders.

### DECISION

The district court abused its discretion by including as income those portions of the distributions made by Dura–Supreme to Kathy to either transfer to TK Investments or to pay her tax liability on her share of the corporate retained income. We therefore reverse and remand for the district court to recalculate Kathy's gross income and determine any child support accordingly.

**Reversed and remanded.**