In re the Marriage of Kathy Lynn
HAEFELE, Respondent,

v.

Douglas Alan HAEFELE, Appellant.

No. A11–1225.

Supreme Court of Minnesota.

May 29, 2013.

Alan C. Eidsness, Melissa J. Nilsson, Henson & Efron, P.A., Minneapolis, MN, for respondent.

Kay Nord Hunt, Lommen, Abdo, Cole, King & Stageberg, P.A., and Vija L. Brookshire, Messerli & Kramer, P.A., Minneapolis, MN, for appellant.

## OPINION

DIETZEN, Justice.

Appellant Douglas Haefele (Douglas) and respondent Kathy Haefele (Kathy) were divorced pursuant to a judgment and decree filed in 2000, which provided, among other things, that Douglas pay child support to Kathy. In 2010, Douglas moved to modify his child-support obligation, arguing that certain distributions paid to Kathy as a shareholder of a closely-held subchapter S corporation should be included in her "gross income," as defined by Minn.Stat. §§ 518A.29(a) and 518A.30 (2012), for the purpose of calculating the child-support amount. The district court agreed and granted the motion. The court of appeals reversed, concluding that the distributions either were not available to Kathy or were designated to pay her income tax obligation, and therefore did not constitute gross income within the meaning of the statutes. Because we conclude that gross income from a shareholder's interest in a closely-held subchapter S corporation must be calculated using the statutory formula in Minn.Stat. § 518A.30 and does not depend on the amount actually distributed or available to the parent

shareholder, we reverse the court of appeals and remand to the district court for further proceedings consistent with this opinion.

Douglas and Kathy were married in 1990 and had three children during the course of their marriage. They separated in January 2000 and eventually negotiated and entered into a marital termination agreement. On December 15, 2000, the district court filed a judgment and decree dissolving the marriage. The court awarded Kathy physical custody of the children, subject to Douglas's right of reasonable visitation. The decree imposed upon Douglas a child-support obligation of $1,794 per month and ordered him to maintain health and dental insurance for the children.

In September 2010, after intervening amendments to Minnesota's child-support statutes, Douglas moved to modify his child-support obligation. Both parties submitted affidavits describing their financial situations. The parties agreed that Douglas's gross annual income was $178,056, but could not agree on Kathy's gross income. Kathy argued that her gross annual income was $146,947, while Douglas contended that it was $1,759,252. The reason for the disagreement turned largely on whether certain distributions paid to Kathy from Dura–Supreme, Inc., should be included in her gross-income calculation.

The affidavits established that Dura–Supreme is a subchapter S corporation, jointly owned by Kathy and her two brothers: Kevin and Keith Stotts (Kevin and Keith). Kathy and Kevin each own 20% of the company. Keith is the majority shareholder and oversees the day-to-day operation of the business. Kathy considers herself a "passive investor" in the company. She does not work at Dura–Supreme and exercises no control over the business.

But Kathy's 20% ownership of the company does have certain tax consequences. As a subchapter S corporation, Dura–Supreme is subject to a pass-through taxation system, under which its earnings are not taxed at the corporate level. I.R.C. § 1363(a), 1366(b) (2006). Rather, corporate profits are deemed to pass through directly to the shareholders on a pro rata basis and are reported on the shareholders' individual tax returns. *See* I.R.C. §§ 1363(a)–(b), 1366(a)–(b) (2006). Therefore, Kathy must pay individual income taxes on her 20% share of Dura–Supreme's annual corporate earnings, regardless of whether the company actually distributes those earnings to the shareholders or keeps possession of the money as retained earnings. *See* I.R.C. § 1366(a)(1), (c).

Dura–Supreme set a business goal to achieve gross annual sales of $150 million. But the company had a manufacturing capacity limited to producing only $125 million in gross annual sales. Therefore, the company devised an expansion plan. The company planned to self-finance at least some of the expansion and began accumulating significant cash reserves. In 2008, Dura–Supreme's legal counsel and audit firm recommended that the company transfer its cash reserves to a separate business entity in order to protect the company from the "risk of unknown corporate liabilities." The plan was for this separate business entity to act as a lender for Dura–Supreme's expansion. Kathy and her brothers would transfer Dura–Supreme's cash reserves over to the separate business entity, and the separate business entity would then lend the money back to Dura–Supreme at a favorable interest rate to finance the expansion.

In 2009, therefore, Kathy and her brothers created TK Investments, LLC, and signed a Member Control Agreement (the Agreement) for the company. Section 2.1

of the Agreement provided that each sibling "shall make an initial Capital Contribution ... to the Company in exchange for [his or her] initial Interest." With respect to additional capital contributions, the Agreement provided that "[n]o Member shall at any time have any obligation to make any Capital Contributions to [TK Investments] in addition to those provided for in Section 2.1 (initial capital and interests)." But the Agreement provided that "[o]n behalf of the Members, Dura–Supreme, Inc. shall be permitted to transfer all or a portion of any dividend distribution, as authorized by the board of directors ... directly to [TK Investments], and, as directed by Dura–Supreme, Inc., such dividend distribution shall be deemed to be an additional capital contribution to [TK Investments] on behalf of the Members." Finally, the Agreement provided that each sibling would have a one-third ownership interest in TK Investments, but that Keith would retain all the voting rights. Kathy has no control over TK Investments' operations.

Between 2007 and 2009, Dura–Supreme made several distributions to Kathy (or on her behalf), which are the subject of this dispute: $885,300 in 2007, $2,647,000 in 2008, and $1,417,149 in 2009. Although the record lacks detail as to the precise nature and mechanics of these distributions, they served three basic purposes. First, Kathy retained a relatively small portion of the distributions for herself, and she agreed before the district court that the amounts she retained should be included in her gross income. Second, money from Dura–Supreme's distributions in 2008 and 2009 was used to fund TK Investments. Specifically, of the 2008 distributions, $1,600,000 was initially deposited into the Stotts Family Revocable Trust and, after the creation of TK Investments in 2009, was transferred from the trust to TK Investments. Of the 2009 distributions, $1,090,000 was transferred to TK Investments.[1] Third, portions of the Dura–Supreme distributions in 2007–09 were used to cover Kathy's income tax liability on her share of Dura–Supreme's annual corporate earnings. Of the 2007–09 distributions, $777,800 was applied to Kathy's income taxes in 2007, $567,500 in 2008, and $254,650 in 2009.

In sum, Kathy received $4,949,449 in distributions from Dura–Supreme between 2007 and 2009, with $2,690,000 ultimately transferred to TK Investments, and another $1,599,950 applied to pay her income tax liability on Dura–Supreme's corporate earnings. Kathy argued to the district court that the money transferred to TK Investments and applied to her taxes should not be included in her gross income, while Douglas argued that the total amount distributed should be included.

On May 5, 2011, the district court issued an order modifying Douglas's child-support obligation. The court found that Kathy was not attempting to hide money in the family companies or avoid her child-support obligation. But the court ultimately held that "the law is clear that distributions are income for the purposes

1. The record is unclear as to whether the money was distributed first to Kathy and then relayed to the trust and TK Investments, or whether the money was transferred *directly* from Dura–Supreme on Kathy's behalf without ever touching her hands. Kathy's affidavit stated that, at least in 2009, the funds were "transferred directly from Dura–Supreme to TK Investments." Dura–Supreme's Chief Financial Officer, on the other hand, testified that "cash reserves were distributed to the shareholders and then, in turn, immediately transferred into a new entity." In any case, as discussed below, the disposition of this appeal does not depend on the exact mechanics of the transfer or whether the money was paid directly to Kathy or to a separate entity on her behalf.

of determining child support." The court concluded that whether the funds were available to Kathy to pay child support was irrelevant, noting that the "subsequent availability of income received is not mentioned in Minn.Stat. § 518A.29." The court also rejected Kathy's argument that the funds distributed to pay income taxes should be excluded because the payment of taxes is an ordinary and necessary expense required for business operation. The court reasoned that allowing Kathy to exclude the amount applied to taxes would contravene the command of section 518A.29 that child support be based on gross (not net) income. Therefore, the district court held that all $4,949,449 of Dura–Supreme's distributions met the definition of gross income in Minn.Stat. § 518A.29. The court modified Douglas's child-support obligation to $281 per month and ordered Kathy to pay Douglas $395 per month as her share of the children's medical and dental insurance coverage.

The court of appeals reversed, concluding that the district court erred by including in Kathy's gross income the Dura–Supreme distributions transferred to TK Investments. *Haefele v. Haefele,* 814 N.W.2d 65, 70 (Minn.App.2012). The court noted that, under its decision in *Hubbard County Health & Human Services v. Zacher,* 742 N.W.2d 223 (Minn.App.2007), earnings *retained* by a subchapter S corporation are generally not gross income if they are retained for a legitimate business reason rather than to shield or manipulate assets to avoid a child-support obligation. *Haefele,* 814 N.W.2d at 69. Although the court acknowledged that the money in this case was not retained, but was actually distributed to TK Investments for its shareholders, the court reasoned that *Zacher* should nonetheless apply because Kathy served only as a "conduit" to move money from Dura–Supreme to TK Investments, *id.* at 68–69, and her "only certain use of the funds was to deposit them as she promised," *id.* at 70. The court also held that the district court erred by including in Kathy's gross income the Dura–Supreme distributions used to cover her share of the income taxes on the company's earnings. *Id.* at 71. The court concluded that these distributions were "ordinary and necessary expenses required for self-employment or business operation," and thus excluded from gross income under Minn.Stat. § 518A.30. *Haefele,* 814 N.W.2d at 71. Therefore, the court of appeals reversed and remanded to the district court to recalculate child support. *Id.* at 72.

I.

The issue in this case is the proper calculation of Kathy's "gross income" for the purpose of determining child support. Douglas contends that the court of appeals erred in concluding that the Dura–Supreme distributions to Kathy to fund TK Investments and pay income taxes do not constitute gross income to Kathy. He argues that the statutory definition of gross income in Minn.Stat. § 518A.29 is expansive and imposes a bright-line rule that "[a] distribution made by the corporation to its shareholders is income to the distributee." According to Douglas, the purpose of distributed funds, or how Kathy uses those funds after distribution, is irrelevant. Kathy counters that the Dura–Supreme distributions are not gross income because they are "not a dependable source for child support, as they are not available to [her], and [she] has no ability to pay child support from these unavailable funds." She emphasizes that she is a minority shareholder with no power to control distributions, there is a legitimate business purpose for the distributions, and there is no evidence that she is attempting to avoid her child-support obligations.

Generally, we review orders modifying child support for abuse of discretion, *Gully v. Gully*, 599 N.W.2d 814, 820 (Minn.1999), and will reverse only if the district court "abused its broad discretion by reaching a clearly erroneous conclusion that is against logic and the facts on record," *Putz v. Putz*, 645 N.W.2d 343, 347 (Minn.2002). But the principal issue in this case is the interpretation of "gross income" as defined in Minn.Stat. § 518A.29(a) and, by incorporation, Minn. Stat. § 518A.30. We review issues of statutory interpretation de novo. *Harris v. Cnty. of Hennepin*, 679 N.W.2d 728, 731 (Minn.2004). The purpose of all statutory interpretation is to ascertain and effectuate the intention of the Legislature. *Boutin v. LaFleur*, 591 N.W.2d 711, 715 (Minn. 1999). When the statutory language is plain and unambiguous, we will look only to that language in ascertaining legislative intent. *Id.; see also* Minn.Stat. § 645.16 (2012). Therefore, we begin our analysis with the language of the child-support statutes.

### A.

Minnesota Statutes §§ 518A.26 to 518A.43 (2012) provide the procedure for the computation of child support. First, the district court calculates the *presumptive* child-support obligation of the obligor parent.[2] Minn.Stat. § 518A.34(a). Each parent's gross income is the starting point for this calculation. Minn.Stat. § 518A.34(b)(1). The court applies the parents' combined monthly gross income to the child-support guideline table in section 518A.35, subd. 2, to find the applicable total child-support figure, which is then apportioned between the parents based on the percentage each parent contributes to the combined monthly income. Minn.Stat. § 518A.34(b)(3)–(5). For example, if the obligor parent contributes 60% of the parents' combined gross income, he or she is also responsible for 60% of the total child-support obligation. Along the way, certain adjustments or credits may apply based on whether the parents have nonjoint children[3] and each parent's amount of parenting time. *See* Minn.Stat. §§ 518A.34(b)(2), (6), 518A.36. The child-support obligation calculated using this process establishes a "rebuttable presumption." Minn.Stat. § 518A.35, subd. 1(a).

Second, Minn.Stat. § 518A.43 requires the district court to consider certain statutory factors in addition to gross income and the child-support guidelines to determine whether to depart from the presumptive child-support obligation. Specifically, the statute states that, "in setting or modifying child support or in determining whether to deviate upward or downward from the presumptive child support obligation," the district court "must take into consideration" certain additional factors, such as:

(1) all earnings, income, circumstances, and resources of each parent, including real and personal property . . . ;

(2) the extraordinary financial needs and resources, physical and emotional condition, and educational needs of the child to be supported;

(3) the standard of living the child would enjoy if the parents were currently living together, but recognizing that the parents now have separate households;

. . . .

---

2. The "obligor" is presumed to be the parent who does *not* have primary physical custody of the children (in this case, Douglas). *See* Minn.Stat. § 518A.26, subd. 14.

3. A nonjoint child is a child of only "one, but not both of the parents in the support proceeding." Minn.Stat. § 518A.26, subd. 12.

(5) which parent receives the income taxation dependency exemption . . . ;

(6) the parents' debts as provided in subdivision 2. . . .

Minn.Stat. § 518A.43, subd. 1. The district court must make written findings in every case, but if the court decides to deviate from the presumptive child-support obligation, those findings must include "the reasons for the deviation" and "how the deviation serves the best interests of the child." Minn.Stat. § 518A.37, subd. 2(4)–(5).

As noted above, in order to determine the presumptive child-support obligation, the court must calculate "the gross income of each parent." Minn.Stat. § 518A.34(b)(1). Minnesota Statutes § 518A.29 specifically defines "gross income" as including:

> any form of periodic payment to an individual, including, but not limited to, salaries, wages, commissions, self-employment income under section 518A.30, workers' compensation, unemployment benefits, annuity payments, military and naval retirement, pension and disability payments, spousal maintenance received under a previous order or the current proceeding, Social Security or veterans benefits provided for a joint child under section 518A.31, and potential income under section 518A.32.

Minn.Stat. § 518A.29(a). The statutory phrase "self-employment income" set forth in section 518A.29(a) is further defined in section 518A.30, which provides in relevant part:

> For purposes of section 518A.29, income from self-employment or operation of a business, including joint ownership of a partnership or closely held corporation, is defined as gross receipts minus costs of goods sold minus ordinary and neces-

sary expenses required for self-employment or business operation.

Minn.Stat. § 518A.30.

### B.

In analyzing whether the Dura–Supreme distributions should be classified as "gross income" under the child-support statutes, both the district court and the court of appeals relied on *Hubbard County Health & Human Services v. Zacher*, 742 N.W.2d 223 (Minn.App.2007). In that case, the appellant Shane Zacher was a minority shareholder in a subchapter S corporation. *Id.* at 225–26. In 2005, he reported $53,098 in subchapter S corporation earnings on his tax return, but the corporation retained those earnings and they were not actually distributed. *Id.* at 226. The district court included the retained earnings in Zacher's income for purposes of calculating his child-support obligation. *Id.* But the court of appeals reversed, holding that the primary question in determining whether a subchapter S corporation's undistributed earnings are "income" to a minority shareholder is "whether the corporation retained the earnings for a business reason or retained them to enable the obligor to 'shield income' or 'manipulate' the amount of money he receives in order to reduce or avoid his child-support obligation." *Id.* at 227. The court explained that whether undistributed earnings are retained for a business reason is a fact question to be analyzed on a case-by-case basis. *Id.* at 228. "The degree of control that Zacher has over corporate operations is certainly relevant, but the fact that he is a minority shareholder and did not actually receive his portion of the earnings is not alone determinative." *Id.* Because the district court made no findings on this issue, the court of appeals remanded the case for further proceedings. *Id.* at 228–29.

Kathy argues that "the analysis adopted in *Zacher* should be extended to this case," while Douglas argues *Zacher* is distinguishable. We conclude that *Zacher* is inapposite for two reasons. First, *Zacher* was decided under the 2004 version of the child-support statutes, which contained materially different language than the present statute. *See* 742 N.W.2d at 226–27 & n. 1 (citing Minn.Stat. § 518.551 (2004)). In particular, the predecessor statute's provision on self-employment income did not address the issue of income from the "operation of a business" or "joint ownership of a ... closely held corporation." *Compare* Minn.Stat. § 518.551, subd. 5b(f) (2004), *with* Minn.Stat. § 518A.30 (2012). Thus, the *Zacher* court did not have the benefit of the current statutory language, which manifests the Legislature's intent to treat income from joint ownership of a close corporation as a form of self-employment income under section 518A.30. Second, even if *Zacher* had been decided under current law, its analysis would lack a foundation in the text of the statute. Neither section 518A.29(a) nor section 518A.30 uses language that suggests that the definition of gross income turns on concepts such as the existence of legitimate business reasons for retaining or distributing earnings, whether the parent is shielding income, or the extent of shareholder control over the company. While these are no doubt legitimate concerns from a public policy perspective, we cannot read them into the statute unless they have some basis in the statutory text. Where, as here, the statutory language is unambiguous, we are bound to apply the statute as written. *Hans Hagen Homes, Inc. v. City of Minnetrista,* 728 N.W.2d 536, 539 (Minn.2007).

## II.

Having found *Zacher* inapposite, we return to the plain language of Minn.Stat. §§ 518A.29 and 518A.30 in order to determine the proper method for calculating Kathy's gross income. Both parties rely on section 518A.29(a) to support their positions. Douglas contends that the Dura–Supreme distributions are periodic payments, and Kathy counters that the distributions are not available and therefore are not payments.

### A.

Minnesota Statutes § 518A.29(a) provides the general definition of "gross income." Under the plain language of that section, the relevant inquiry in determining whether money or a thing of value is gross income is whether it is a "periodic payment to an individual." *Id.* The statute uses broad language: "any form of periodic payment ... including, but not limited to" the enumerated examples. *Id.* Although we have had few occasions to interpret section 518A.29(a), we have suggested that the Legislature's use of the term "payment" in this section generally means that a benefit must be actually received by the parent, as opposed to merely vested or owed, in order to constitute income. *See Lee v. Lee,* 775 N.W.2d 631, 638 (Minn. 2009). The statute also requires that the payment be "periodic." Minn.Stat. § 518A.29(a). We have not interpreted the term "periodic" in the child-support context, but it generally means "marked by repeated cycles," or "[h]appening or appearing at regular intervals." *American Heritage Dictionary of the English Language* 1307 (4th ed.2004).

But the definition of gross income under section 518A.29(a) explicitly incorporates "self-employment income under section 518A.30." Minn.Stat. § 518A.29(a). Section 518A.30, in turn, provides a formula for calculating "income from self-employment or operation of a business." Unlike the general definition of gross income un-

der section 518A.29(a), income under section 518A.30 does not depend on whether a parent has received a "periodic payment" from the business. *Compare* Minn.Stat. § 518A.29(a), *with* Minn.Stat. § 518A.30. Indeed, nothing in the language of section 518A.30 suggests that money must be actually received by a parent at all in order to be included in income under that section. Rather, the statute instructs district courts to calculate income from self-employment or operation of a business using the formula provided in section 518A.30 itself: "gross receipts minus costs of goods sold minus ordinary and necessary expenses required for self-employment or business operation." In other words, under section 518A.30, the district court must first identify the business's gross receipts, cost of goods sold (if applicable), and ordinary and necessary expenses, and then apply the formula by subtracting the cost of goods sold and ordinary and necessary expenses from the business's gross receipts in order to arrive at the parent's income from self-employment or operation of a business.[4] The income calculated from the formula is then incorporated into the parent's "gross income" under section 518A.29(a).

We conclude that, under Minn.Stat. § 518A.30, when determining child support, a parent's income from self-employment or operation of a business includes the parent's income from joint ownership of a closely-held subchapter S corporation. We acknowledge that neither party addressed the applicability of section 518A.30 on appeal. But we cannot ignore the statute's plain language. Specifically, section 518A.30 applies to the calculation of income from self-employment or operation of a business, which the Legislature expressly defined to include a parent's "joint ownership of a partnership or closely held corporation." Minn.Stat. § 518A.30. As a corporation owned exclusively by three siblings, Dura–Supreme is a closely-held corporation [5] and there is no dispute that Kathy is a joint owner of that corporation. Accordingly, the question of Kathy's income from Dura–Supreme must be analyzed under section 518A.30, rather than solely under the general definition of gross income in section 518A.29(a).

### B.

We next consider whether the district court and the court of appeals erred in failing to apply section 518A.30 to determine Kathy's gross income. With respect

4. In cases in which the parent is the sole owner of the business, the resulting amount is the parent's income from self-employment or business operation. The statute does not explicitly address how the final amount should be apportioned when the parent is only a *joint* owner of the business. However, because the clear command of the statute is to determine the gross income "of each parent," *see* Minn. Stat. § 518A.34(b)(1), in the case of multiple ownership, the district court must calculate the amount of business income attributable to that parent's ownership interest. In other words, if a parent is a 20% owner of a business, only 20% of the income calculated under the statutory formula in section 518A.30 should be attributed to the parent.

5. Section 518A.30 does not define "closely held corporation," and the term is defined somewhat inconsistently in other Minnesota statutes. *Compare* Minn.Stat. § 176.011, subd 2a (2012) (defining a closely-held corporation as "a corporation whose stock is held by no more than ten persons"), *with* Minn. Stat. § 302A.011, subd. 6a (2012) (defining a closely-held corporation as "a corporation which does not have more than 35 shareholders"); *see also Westland Capital Corp. v. Lucht Eng'g Inc.*, 308 N.W.2d 709, 712 (Minn.1981) (discussing the common law characteristics of closely-held corporations). We need not determine the outer limits of what constitutes a closely-held corporation in this case because Dura–Supreme would qualify under any definition.

to the Dura–Supreme distributions to Kathy to fund TK Investments, the district court held that the distributions were properly included in her gross income because the money had been distributed outside of the corporation. The court of appeals concluded that, even though the funds were distributed outside the corporation, they should not be included in Kathy's gross income because they were unavailable to Kathy. *Haefele,* 814 N.W.2d at 69–70.

■ Neither the analysis of the district court nor the court of appeals can be reconciled with the plain language of Minn. Stat. § 518A.30. The district court erroneously focused on the amount of money *distributed* by Dura–Supreme. The court of appeals accepted the premise that the question was whether the amount distributed was income, and focused on whether the distributed amounts were actually *available* to Kathy. *See Haefele,* 814 N.W.2d at 69–70. But the definition of income from self-employment or operation of a business under section 518A.30 does not turn on whether the corporation has "distributed" the funds, or whether the funds are "available" to the parent. Instead, section 518A.30 required the district court to identify Dura–Supreme's gross receipts, cost of goods sold, and ordinary and necessary expenses; then use those figures and apply the statutory formula to arrive at Kathy's income from self-employment or operation of a business. The portion of the resulting figure attributable to Kathy's ownership interest must then be incorporated into her "gross income" under Minn.Stat. § 518A.29(a). Here, however, the district court did not identify Dura–Supreme's gross receipts, cost of goods sold, or ordinary and necessary expenses, or apply the statutory formula.[6] The court of appeals also failed to analyze the income from Kathy's joint ownership of Dura–Supreme under section 518A.30. That failure was an error of law, and requires us to reverse the court of appeals and remand to the district court for application of section 518A.30.

The second issue addressed by the district court and the court of appeals was whether the Dura–Supreme distributions to pay Kathy's income taxes should be included in her gross income. Both courts determined that the outcome of this issue turned solely on whether a subchapter S corporation's payments to its shareholders to cover their income taxes for their share of corporate earnings is an ordinary and necessary expense. The district court held that the payment of Kathy's income taxes on her share of Dura–Supreme's earnings could not be an ordinary and necessary expense because it would result in her income being computed on a "net" or after-tax basis rather than a gross basis. The court of appeals reversed, concluding that the district court abused its discretion because the tax liability was created by the business and the money did

---

6. It is true that Douglas urged the district court to calculate Kathy's gross income based on Dura–Supreme's distributions, and did not specifically argue for application of the statutory formula in section 518A.30. But regardless of the specifics of Douglas's argument, the issue of Kathy's gross income from Dura–Supreme was placed squarely before the district court, and the child-support statutes impose an independent obligation on the court to determine the gross income of each parent by applying section 518A.29 and, by incorpo-

ration, section 518A.30. *See* Minn.Stat. § 518A.34(b)(1) (stating that the district court "shall ... determine the gross income of each parent under section 518A.29"). In determining Kathy's gross income, therefore, the district court was not required to make a binary choice between Douglas's or Kathy's position, but rather was required to undertake its own assessment under the plain language of the applicable statutes. By failing to apply the statutory formula under section 518A.30, the district court erred.

not reduce Kathy's living expenses. *See Haefele*, 814 N.W.2d at 71–72.

■ We conclude that the court of appeals erred in determining that the income-tax payments must be excluded. The plain language of Minn.Stat. § 518A.30 gives the district court broad discretion to determine whether to allow a parent to deduct an expense, even an otherwise ordinary and necessary expense, from income. The statute provides: "[s]pecifically excluded from ordinary and necessary expenses are … *any other business expenses determined by the court to be inappropriate or excessive* for determining gross income for purposes of calculating child support." Minn.Stat. § 518A.30 (emphasis added). Here, the district court's rejection of the tax payments as ordinary and necessary expenses was not an abuse of its broad discretion. The district court reasoned that Kathy "is essentially asking the Court to calculate child support based upon … her after tax income," contrary to the statute's repeated and consistent instruction that income for child-support purposes shall be *gross* income. *See, e.g.*, Minn.Stat. §§ 518A.26, subd. 8, 518A.28(a), 518A.29, 518A.30, 518A.34(b)(1). Although previous versions of the child-support statutes used the phrase "net income," which was defined, in relevant part, as total monthly income less "[f]ederal income tax" and "[s]tate income tax," *see* Minn.Stat. § 518.551, subd. 5(b) (2000), the present statute does not use the phrase "net income" or make reference to the exclusion of income taxes, *see, e.g.*, Minn.Stat. § 518A.29; *see also* Act of June 3, 2005, ch. 164, §§ 7, 14, 2005 Minn. Laws 1878, 1887–88, 1900 (striking "net income" and replacing it with "gross income"). The district court reasonably concluded that, in order to give effect to the term "gross income," it was necessary to deny a deduction for any amounts used to pay income taxes. Moreover, the district court used Douglas's pre-tax salary as the basis for his gross income, and thus using pre-tax figures for Kathy's income treated the parties equally.[7] Because the district court could fairly conclude that the payment of income taxes was an "inappropriate" deduction or expense in this context, we reverse the court of appeals on this issue.

Nevertheless, a remand is still necessary. Even though the district court did not abuse its discretion in holding that the tax payments were not ordinary and necessary expenses, the identification of ordinary and necessary expenses is only a single element of the statutory income formula under section 518A.30. The court must first identify the business's gross receipts and costs of goods sold. Any ordinary and necessary expenses allowed must be subtracted from the "gross receipts" of the *business*, not from the amount that Kathy received, as the court of appeals concluded. *See* Minn.Stat. § 518A.30. Instead of identifying the proper figures, both the district court and the court of appeals treated the amount distributed as a substitute for gross receipts and costs of

---

7. The court of appeals concluded that the district court erred by including the Dura–Supreme distributions to Kathy to pay her taxes, because it believed that excluding those payments was necessary to treat subchapter S corporations (whose shareholders shoulder the income-tax burden) the same as traditional C corporations (that pay their own income taxes). *Haefele*, 814 N.W.2d at 71. This concern is addressed by our holding today that income from the joint ownership of all closely-held corporations (whether C or S corporations) is calculated pursuant to the statutory formula in Minn.Stat. § 518A.30 regardless of the amount distributed to the parent. Whatever type of closely-held corporation is involved, the parent's income from operation of a business will be the corporation's gross receipts minus cost of goods sold and ordinary and necessary expenses.

goods sold. The amount the shareholder receives is not the relevant inquiry under section 518A.30. Therefore, the failure to identify Dura–Supreme's gross receipts, costs of goods sold, and ordinary and necessary expenses requires remand to the district court.

### III.

We acknowledge that, in the case of parents who are owners of closely-held corporations or partnerships, our interpretation of Minn.Stat. § 518A.30 extends the definition of gross income for child-support purposes to reach funds that the corporation has not distributed and are not available to the parent. Although such a result is required by the plain language of section 518A.30, we recognize that strict application of the rule could have significant potential for unfairness, including in cases in which the parent is a minority owner of the business and has no power to control when or how much of her share of the earnings the business distributes to her.

 It is important to remember that gross income is only the *starting point* for the child-support analysis, and the obligation calculated by applying gross income to the child-support guidelines is merely a rebuttable presumption. *See* Minn.Stat. §§ 518A.34(a), 518A.35, subd. 1(a). In setting the ultimate child-support obligation for a parent, the statute requires district courts to look beyond the definition of gross income to such things as "all earnings, income, circumstances, and resources of each parent, including real and personal property," and "the standard of living the child would enjoy if the parents were currently living together." Minn.Stat. § 518A.43, subd. 1. The plain meaning of phrases such as "standard of living," and "all ... circumstances, and resources," allows the district court to consider, among other things, the extent to which the par-

ent's gross income is actually *available* to him or her to pay support. *See id.* In the exercise of its discretion, the district court may depart from the guidelines in appropriate cases based on the unavailability of money included in gross income, or based on other facts or considerations that suggest that the guidelines do not accurately represent the amount of the child-support obligation for which a parent should be responsible. *See* Minn.Stat. §§ 518A.37, subd. 2, 518A.43, subd. 1

On remand, after recalculating Kathy's gross income and the presumptive child-support obligation under the guidelines, the district court must consider whether to adhere to or deviate from the guidelines after considering the factors in Minn.Stat. § 518A.43, subd. 1. We express no opinion as to whether such a deviation is appropriate in this case.

Reversed and remanded.

