June 3, 2019

**Supreme Court**

No. 2017-123-Appeal.
(P 14-484)

Joel Trojan                    :

v.                    :

Denise Trojan.                    :

NOTICE:  This opinion is subject to formal revision before publication in the Rhode Island Reporter.  Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

Joel Trojan                    :

v.                             :

Denise Trojan.                 :


Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

### O P I N I O N

**Justice Flaherty, for the Court.**   The defendant, Denise Trojan, appeals from a judgment of the Family Court ordering the plaintiff, Joel Trojan, to pay $1,796 per month in child support for their minor child, Tiffany, who was born in July 2001.[1]  Denise argues that the trial justice erred when he did not order Joel to pay interim and retroactive child support.  Denise also contends that the trial justice erred in determining Joel's gross income for the purpose of calculating his child support obligation because the trial justice did not include income and distributions from an "S" corporation, of which Joel is the sole shareholder.  This case came before this Court for oral argument pursuant to an order directing the parties to appear and show cause why the issues raised in this appeal should not summarily be decided. After hearing the arguments of counsel and examining the memoranda filed on behalf of the parties, we are of the

---

[1] To protect the minor child's privacy, we have given her a pseudonym.  We also note that the parties have an adult child who is not the subject of this appeal.  Additionally, for the sake of clarity, we refer to the parties and others by their first names; we intend no disrespect.

opinion that cause has not been shown, and we proceed to decide the appeal at this time without further briefing or argument. For the reasons set forth in this opinion, we affirm in part and vacate in part the judgment of the Family Court.

## I

## Facts and Travel

## A

## The Underlying Divorce Proceeding

The parties married in July 1990. In March 2014, Joel filed for divorce and alleged that there were irreconcilable differences which had led to the irremediable breakdown of the marriage. Denise thereafter filed a counterclaim for divorce, which sought, *inter alia*, child support for Tiffany. On December 16, 2015—the first day of trial—the parties entered into a consent order in which they agreed to the following: (1) joint custody of Tiffany, with physical placement with Denise; (2) that Joel would be awarded all reasonable rights of parenting time with Tiffany; (3) that the marital estate—after allocating for certain cash withdrawals that Denise previously had made—would be divided equally between the parties; and (4) that neither party would address the conduct or fault of the other in connection with the court's consideration of equitable distribution and alimony.

On that same date, Denise was heard on a motion for temporary allowances, which she had filed just two weeks before, on November 30, 2015. Her counsel argued before the trial justice that, during the course of the divorce action, the parties had shared a joint marital account that Denise had been using to support herself and Tiffany. However, she alleged that the account had become depleted approximately one month before the trial began, and that Joel had stopped depositing money into it. Denise's counsel then represented to the trial justice that, based on her

calculations, Joel was earning $1.8 million per year. Consequently, Denise asserted that she would be entitled to $16,000 per month in child support pursuant to the child support guidelines worksheet and this Court's decision in *Tamayo v. Arroyo*, 15 A.3d 1031 (R.I. 2011).

In response, Joel's counsel argued that there was "at least a million dollars" in the joint account, and that the parties had agreed to divide that account equally. As a result, according to Joel, Denise received $505,000 from the joint marital account in late November, which was around the same time that she filed her motion for temporary allowances. Additionally, Joel argued that Denise's calculation of his earnings was incorrect because it reflected certain pass-through income that he received from Century Drywall, Inc. (Century), an S corporation of which he was the sole shareholder.[2] Joel also alleged that, after the joint marital account was equally divided, he offered to pay Denise half his monthly salary to support her and Tiffany. This amount, according to Denise's counsel, was approximately $7,000 per month. Denise had rejected that offer, and chose to pursue child support in the amount of $16,000 per month because, according to Denise, Joel was receiving distributions—in addition to a salary—from Century.

The trial justice asked Denise's counsel whether Tiffany needed the amount of child support that she was requesting; Denise's counsel replied: "Well, the child doesn't need

---

[2] As we have previously mentioned, "[a]n 'S' corporation is a preexisting, closely held corporation that elects to be taxed under Subchapter S of the Internal Revenue Code." *DiLuglio v. Providence Auto Body, Inc.*, 755 A.2d 757, 763 n.4 (R.I. 2000). "Generally, once the Internal Revenue Service grants this special tax designation to a corporation, the 'Subchapter S' corporation's income 'is not taxed at the corporate level but is passed through and taxed to its shareholders, in a similar fashion as a partnership.'" *Id.* (quoting 18 Am. Jur. 2d *Corporations* § 40 (1985)). "The primary advantage of a 'Subchapter S' corporation is the avoidance of double taxation on both individual shareholder and corporate income." *Id.* "Although the 'Subchapter S' corporation avoids paying income tax on corporate net income, the individual shareholders are taxed on the income they derive from the corporation, including any salaries and dividends." *Id.* "Thus, certain income, deductions, and losses pass through a 'Subchapter S' corporation to the individual tax returns of each shareholder." *Id.*

[$]16,000 a month." The trial justice pointed out that some states have said it becomes "ludicrous" when an amount that high is requested for child support; he said that counsel could "negotiate with [Joel's counsel] if you'd like, concerning an interim payment; but, if you think this particular judge is going to award on an interim basis $16,000 in child support on a monthly basis, you're sorely mistaken[.]" The trial justice questioned whether Denise was even in need of child support at that time, considering that, according to Joel's counsel, she had just received $505,000 from the division of the joint marital account, and she was using those funds to support herself and Tiffany during the pendency of the divorce action.

Nevertheless, the trial justice concluded that he was "not going to entertain a motion for temporary allowances in anticipation of the divorce hearing[,]" that he was going to "hear it all at the same time[,]" and that he would be willing to award child support retroactively if necessary. Thereafter, from January 2016 until final judgment entered in December 2016, Joel voluntarily paid Denise $2,444 per month in child support.

The divorce case was tried on the merits on various dates between December 2015 and July 2016. Relevant to this opinion, during the trial, Joel testified that Century originally had three shareholders: himself, his brother John Trojan, and his brother-in-law Michael Elliott. From January 2012 to December 2013, however, Joel purchased the interests of both John and Mr. Elliott, and he became the sole shareholder of Century. Joel also testified that he had received distributions from Century to pay off his personal note obligations to John and Mr. Elliott for their interests in the corporation.

At the conclusion of the divorce trial, the parties entered into a marital settlement agreement in which they disposed of all of the marital assets and liabilities, "with the exception of child support and medical[.]" The trial justice reviewed and approved the marital settlement

agreement. On August 19, 2016, a decision pending entry of final judgment was entered, which incorporated, but did not merge, the marital settlement agreement and continued the child support issue. Neither party sought review of that decision.

**B**

**The Child Support Hearing**

Thereafter, on September 28, 2016, the parties reconvened for a hearing on the issue of child support. The trial justice heard testimony from Joel, Denise, and Justin Amico, CPA, who was the accountant for Century and who had prepared the parties' personal income tax returns in the past. Mr. Amico testified that, for the period December 31, 2013, through December 31, 2015, Century retained its excess revenues, thus increasing its stockholder equity. Specifically, Mr. Amico said that Century's total stockholder equity, as of December 31, 2014, was $7,310,276, and according to an "Equity Rollforward Sheet" that was introduced into evidence at the hearing, by the close of 2015, the stockholder equity had increased to $8,361,919. He also testified that, in 2015, Alliant Insurance Services, Inc., a bonding company, required that Century increase its equity to $10 million. Mr. Amico explained that, if Century failed to meet that requirement, the company "could be denied the ability to get a bond which could jeopardize the employment of the 500 to 700 men that Century Drywall employs." It was Mr. Amico's opinion that complying with such a requirement was a legitimate business interest because there was a risk that the company would not be able to secure bonds as it bid on future work if it was undercapitalized. It was therefore imperative, according to Mr. Amico, that Century retain as much of its working capital and equity as possible.

Mr. Amico further testified that, with respect to 2015, Century had $2,692,793 in net income. Of that amount, $1,641,150 was distributed to Joel; he used those funds to pay for taxes

on the corporation's net income, the note payment obligations to John and to Mr. Elliott, and a premium on his life insurance policy. Mr. Amico testified that the remainder of the corporation's 2015 net income, which was approximately $1 million, was retained by the corporation to increase its stockholder equity. It was Mr. Amico's opinion that the distributions that were made to Joel for tax liabilities, as well as the note payments for buying out former shareholders, did not inure to Joel's personal benefit. Moreover, Mr. Amico opined that he never detected any use of Century's revenues for any purpose other than the distributions as set forth in the balance sheet.

The trial justice then asked Mr. Amico directly what the court should use to determine Joel's gross income, to which Mr. Amico replied: "His W-2 wages, his interest and dividends from his brokerage accounts, and any other rental income." After the court further inquired as to whether Century's distributions should be included in Joel's gross income, Mr. Amico specified that Century's profits were never distributed to enhance lifestyles and that, based on his experience with Century, including the distributions in Joel's gross income for child support purposes "would significantly enhance [Tiffany's] standard of living beyond what's been provided to date[.]" Mr. Amico further explained that, if Century began to distribute profits to Joel, thus making them available for his personal use, the bonding company might well reject Century's future bond requests because Century would be "too big and under-capitalized," which would force the company to shrink and would jeopardize the jobs of its workers.

Joel was next to testify; he said that, just a month prior, he had paid Tiffany's school tuition bill, which was $21,800. He also testified that, as part of the marital settlement agreement, he had just recently paid Denise the sum of $2 million. Further, before that payment, he had remitted $274,000 to her for her interest in certain real estate, and $251,048, representing

half of the former couple's 2015 tax refund.  Moreover, Joel testified that, under the terms of the recently signed marital settlement agreement, he was also obligated to make, and fully anticipated making, a payment to Denise for $180,000 on October 1, 2016, as well as another payment of $10,000 on that same date and every month thereafter for a period of 120 months. He confirmed that, in total, Denise had received $2,725,660 in cash from him, in addition to the interest she retained in various bank accounts, brokerage accounts, real estate, and other investments.

Joel further testified that, after Denise filed her motion for temporary allowances, he had begun to make voluntary monthly child support payments to Denise in the amount of $2,444 per month.  That figure, according to Joel, was based on the 2014 wages that were included in his W-2 form, which was $299,325, as well as $257 per month in taxable interest that he received on the joint marital account.  With respect to 2015, Joel stated that his wages were $278,344, or $23,195 per month, plus $246 per month in taxable interest on the joint marital account.  To compute Joel's gross income for child support purposes, the 2015 figures were used by Joel's counsel to complete a child support guideline worksheet that was introduced into evidence.  In finalizing that worksheet, Joel also suggested that a four percent return could be expected on the $2,725,660 that had been transferred to Denise when the marital assets were distributed.[3]  Based on that worksheet, Joel maintained that his child support obligation should be $1,765 per month. He also testified that, prior to 2011, there were years where he had taken personal distributions

---

[3] In calculating the four percent return, Joel's counsel introduced into evidence a page from *The Wall Street Journal* newspaper for interest rates as of September 27, 2016.  That page was entered as a full exhibit.  On the other hand, Denise testified that, at the time of the hearing, she was receiving less than a one percent return on her share of the marital assets.  Those assets were being held in certificates of deposit through two financial advising firms.

from Century; however, he said that none of the distributions since that time had inured to his personal benefit.

When Denise took the witness stand, she provided the court with an extensive list of expenses that she alleged were needed to maintain Tiffany's lifestyle. Included in those expenses were the following: $700 to $800 per month to spend at the mall and for other activities with her friends; $575 every four to six weeks for hair extension maintenance; over $200 per month for hair products; $275 per month on manicures, pedicures, and acrylic nails; $150 to $200 every two weeks on cosmetics; $150 to $200 per month on foot reflexology and massages; between $10,000 to $11,000 per year for vacations, including the cost of bringing one of Tiffany's friends along; $425 per month on clothing and shoes; and $150 per month for functions attended by Tiffany.

On December 14, 2016, the trial justice rendered a bench decision. He first made note of the payments that Denise had received, as well as the payments that remained due to her as a result of the marital settlement agreement. The trial justice then found that Joel's gross salary for 2015 was $278,344, and that he was the 100 percent shareholder of Century. Furthermore, he made a finding that Century's 2015 net income of $1,051,643 was retained by the corporation as working capital for a legitimate business reason, and that the retained earnings were not used to shield or manipulate Joel's income in an effort to reduce or avoid his child support obligation. In arriving at his conclusion, the trial justice relied upon the testimony that Mr. Amico had given at the child support hearing. He found that testimony to be "uncontradicted" and "very informative and quite credible[.]"

He also found that Century's total distributions to Joel in 2015 did not inure to Joel's benefit and that they should not be included in Joel's gross income calculation for child support

purposes. Specifically, the court held that the 2015 distribution to Joel in the amount of $1,235,846, which had been used to satisfy Century's tax obligations, was reported on Joel's income tax return because of the corporation's classification under Subchapter S of the Internal Revenue Code, and that Joel actually had received no portion of that distribution, nor had the distribution inured to his personal benefit in any way. The trial justice also found that a separate 2015 distribution to Joel that had been used to make payments on the promissory notes to the two former shareholders did not inure to Joel's benefit. Similarly, the trial justice held that Joel had not received any portion of another 2015 distribution to him that had been used to pay his life insurance premium. Finally, the trial justice determined that no profits from Century had been dispensed to enhance Joel's lifestyle since the year 2011.

With respect to Denise's original request for an order on interim child support, the trial justice summarized the proceedings as follows:

> "[T]here was some confusion at the time this case initiated relative to a request for temporary orders, as there had not been one earlier, in that the parties had apparently accomplished that by some type of payment of moneys through an account that they both had control over; but, in any event, the Defendant, in fact, filed a motion for temporary allowances, wherein child support was requested on November 30 of 2015. Plaintiff, in fact, filed an objection thereto, and a hearing was held on both the motion and objection back in December, almost exactly to the date, December 16th, 2015. A consent order was filed, but there there [*sic*] was no child support obligation set forth in that order because of the prior practice of * * * the parties * * *; however, the Court notes for the record that the Plaintiff has been paying the sum of $2,444 per month in child support, pursuant to a Guideline prepared by Plaintiff's counsel, at least since January of this particular year."

The trial justice also found that there had been no evidence submitted that would indicate that Tiffany had any financial resources other than from her parents, that the parties' standard of living "was sustained for the most part solely by [Joel's] wages and the parties' taxable interest

- 9 -

received on investments[,]" and that there was no evidence that Tiffany's lifestyle had changed since the parties separated in 2013. Moreover, the court found that the "number of expenses introduced by [Denise] relative to the minor child" were "not only incredulous, but outrageous in some fashion, concerning hair extensions, acrylic nails, foot reflexology, the clothing amount per month, and a number of other expenses."[4] The trial justice also found that a majority of Joel's assets were not liquid, as opposed to Denise's assets, which Joel was paying to her in cash.

The trial justice then found that, based on Joel's 2015 tax returns, Joel's income consisted of the following: "$23,195 per month in wages and $246 per month in taxable interest from various moneys that were in a joint Schwab account, for a total of $23,441" per month. He calculated Denise's gross income to be $6,750 per month, which was based on a three percent rate of return on Denise's share of the marital estate.[5]

Final judgment was entered on December 19, 2016, and an order summarizing the factual findings of the trial justice's decision was entered on December 28, 2016. On that same day, Denise timely appealed the December 19, 2016 judgment.[6]

## II

## Standard of Review

At the outset, we will address an argument raised by Denise in her Rule 12(A) Statement regarding the applicable standard of review. She argues that the trial justice's "misinterpretation

---

[4] Denise argues that the trial justice, in his bench decision, failed to address numerous expenses that her child incurs. However, by referencing "a number of other expenses" and referring to her expenses broadly in the order, it is clear that the trial justice considered all of Tiffany's expenses.

[5] The court also found that a $62,371 taxable refund was reported on the parties' 2015 tax return and $19,752 in a taxable portion of the parties' health insurance were not included in either party's gross income calculation for child support purposes. Moreover, in calculating Denise's monthly gross income, the trial justice did not include $246 per month that Denise receives in taxable interest from the joint Schwab account. However, whether these amounts should have been included as gross income are not before us in this appeal.

[6] We note that Tiffany will be turning eighteen years old in July 2019.

- 10 -

and disregard of the formula set forth in the R.I. Child Support Guidelines is a question of law subject to de novo review by this Court." We disagree. It is axiomatic that "[q]uestions of law in an appeal from the Family Court * * * are reviewed *de novo*." *Vieira v. Hussein-Vieira*, 150 A.3d 611, 615-16 (R.I. 2016) (quoting *Palin v. Palin*, 41 A.3d 248, 253 (R.I. 2012)). However, in *Vieira*, the plaintiff claimed, *inter alia*, that the trial justice erred in calculating his child support obligation by not considering the child support guidelines because an appropriate worksheet was not filed during the course of the divorce proceedings. *Id.* at 618. We reviewed the trial justice's determination—his failure to consider the child support guidelines—under an abuse of discretion standard. *Id.* The same holds true here with respect to all the arguments made by Denise in this appeal.

"General Laws 1956 § 15-5-16.2(a) provides that the Family Court shall order either or both parents owing a duty of support to a child to pay an amount based upon a formula and guidelines adopted by an administrative order of the Family Court." *Vieira*, 150 A.3d at 618 (brackets omitted) (quoting *Waters v. Magee*, 877 A.2d 658, 665 (R.I. 2005); *see* § 15-5-16.2(a). "Moreover, 'we consistently have held that § 15-5-16.2, in conjunction with the support guidelines, requires the trial justice to review the worksheet to determine the base level of child support that the noncustodial parent is required to pay.'" *Id.* (brackets omitted) (quoting *Cardinale v. Cardinale*, 889 A.2d 210, 221 (R.I. 2006)). "It is well established that the appropriate award of child support is to be determined by the trial justice in his or her sound discretion, and we shall not disturb such a determination on review absent a clear abuse of that discretion." *Tamayo*, 15 A.3d at 1035 (quoting *Mattera v. Mattera*, 669 A.2d 538, 542 (R.I. 1996)).

**Discussion**

On appeal, Denise argues that the trial justice's decision ran afoul of § 15-5-16.2(a) because he failed to properly calculate and order temporary child support while the divorce proceeding was pending on December 16, 2015, the first day of the trial, and on July 26, 2016, the day the marital settlement agreement had been entered. Moreover, Denise argues that the trial justice erroneously calculated Joel's child support obligation by excluding Century's 2015 S corporation income and distributions from Joel's gross income.

**A**

**Interim and Retroactive Child Support**

Denise first argues that the trial justice did not adhere to § 15-5-16.2 because he did not formally award child support until December 2016—one year after she first requested interim support. Specifically, she argues that, on the first day of trial, December 16, 2015, her motion for temporary allowances was set down for hearing. She contends that the trial justice erred when he prematurely and peremptorily denied her request for $16,000 per month in child support without first calculating child support under the guidelines. Moreover, she avers that the trial justice repeated that error at the July 26, 2016 hearing, at which the trial justice approved the parties' marital settlement agreement but failed to enter a provisional child support order.

It is our opinion that the trial justice did not abuse his discretion in not awarding child support on December 16, 2015. On that date, Denise's counsel conceded to the trial justice that the minor child, Tiffany, did not require $16,000 per month in child support. Additionally, Denise's counsel acknowledged that Denise had been using funds derived from the joint marital account to support herself and Tiffany while the divorce proceedings were pending. According

to Joel's counsel, that account had been divided equally between the parties a mere week before Denise's counsel moved for temporary allowances. It was represented to the court that Denise had received approximately $505,000 from the division of that account. It is our opinion that Denise has failed to prove that the trial justice erred in any way by not ordering an interim child support award at that time. We conclude that the trial justice acted well within the bounds of his discretion when he ruled that ample funds were available to Denise to support herself and Tiffany during the remainder of the divorce proceeding.[7]

Furthermore, we are of the opinion that Denise's second argument—that the trial justice erred in failing to order retroactive or interim child support at the July 26, 2016 hearing—was not properly raised below and therefore has been waived. On December 16, 2015, the trial justice told Denise's counsel that she could negotiate an interim payment with opposing counsel. However, he forewarned her that, "if you think this particular judge is going to award on an interim basis $16,000 in child support on a monthly basis, you're sorely mistaken[.]" In so doing, the trial justice cited to caselaw outside this jurisdiction for the proposition that "a child only deserves three ponies[.]"[8] Nonetheless, he concluded with the following:

---

[7] Denise had also been using that same account to support herself and Tiffany before the parties divided the account.

[8] In his bench decision on December 14, 2016, the trial justice asserted that he was "a proponent of the theories advanced" in *Downing v. Downing*, 45 S.W.3d 449 (Ky. App. Ct. 2001). In that case, which concerned a modification of child support, the Court of Appeals of Kentucky scrutinized a "share the wealth" approach, which suggests that a court does not need to make findings regarding the children's needs when child support exceeds the maximum guidelines. *Downing*, 45 S.W.3d at 455. The appellate court refused to incorporate this approach, finding that, "[b]eyond a certain point, additional child support serves no purpose but to provide extravagance and an unwarranted transfer of wealth." *Id.* at 456. It recognized that this reasoning is referred to as the "Three Pony Rule," which is, "no child, no matter how wealthy the parents, needs to be provided more than three ponies." *Id.* (citing *Matter of Marriage of Patterson*, 920 P.2d 450, 455 (Kan. Ct. App. 1996)). Denise claims that by relying on *Downing* at the December 16, 2015 hearing, the trial justice peremptorily ruled that such a child support amount would be inequitable to Joel. Even though the trial justice's reference to *Downing* at

- 13 -

> "*I'm not going to entertain a motion for temporary allowances in anticipation of the divorce hearing. I'll hear it all at the same time.* If I have to retroactively make an award of child support at the time of the decision, *if you folks can't agree*, I'll be delighted to do that; but I'm not convinced that your client can't support herself pending this trial, however months or years it goes, quite honestly." (Emphasis added.)

Clearly, the trial justice deferred awarding interim child support in anticipation that the parties would agree upon it. The parties did in fact agree, and there is nothing in the record indicating that Denise raised the issue again at the July 26, 2016 hearing.[9] "[I]n accordance with this Court's longstanding 'raise-or-waive' rule, if an issue was not properly asserted, and thereby preserved, in the lower tribunals, this Court will not consider the issue on appeal." *Adams v. Santander Bank, N.A.*, 183 A.3d 544, 548 (R.I. 2018) (quoting *Miller v. Wells Fargo Bank, N.A.*, 160 A.3d 975, 980 (R.I. 2017)). For this reason, we are satisfied that Denise has waived this argument.

In the face of that waiver, however, it is worth noting that, in January 2016, Joel voluntarily agreed to pay, and Denise accepted, $2,444 per month in interim child support while the divorce proceeding was pending. Those payments continued until December 2016, when final judgment was entered.[10]

---

such an early stage of the proceeding may have been premature, we do not conclude that it approaches reversible error. Moreover, we note that the trial justice's eventual finding regarding the parties' combined gross income did not exceed the Family Court child support guidelines.

[9] We also note that that argument was not raised at the September 28, 2016 hearing, which centered solely on the issue of child support. Furthermore, after the September 28, 2016 hearing, the parties were given thirty days to submit memoranda to the court supporting their respective positions on the issue. Although Joel filed a memorandum with the court, Denise never did.

[10] Moreover, in the course of his bench decision on December 14, 2016, the trial justice reiterated that Denise had been receiving those interim payments from Joel.

- 14 -

**B**

**Century's Net Income and Distributions**

Denise next contends that the trial justice wrongfully excluded Century's net income and distributions to Joel when he calculated Joel's gross income for the purpose of determining his child support obligation. She argues that the definition of gross income found in the applicable Family Court administrative order is broad enough to encompass income and distributions from an S corporation. She also avers that the trial justice had a "mandatory obligation" to follow the formula set forth in the Family Court administrative order and this Court's reasoning in *Tamayo* and, had he done so, he would have properly imputed Century's income and distributions to Joel's gross income.

Section 15-5-16.2(a) states, in pertinent part:

> "In a proceeding for * * * child support, the court shall order either or both parents owing a duty of support to a child to pay an amount based upon a formula and guidelines adopted by an administrative order of the family court. If, after calculating support based upon court established formula and guidelines, the court, in its discretion, finds the order would be inequitable to the child or either parent, the court shall make findings of fact and shall order either or both parents owing a duty of support to pay an amount reasonable or necessary for the child's support after considering all relevant factors including, but not limited to:
>
> "(1) The financial resources of the child;
>
> "(2) The financial resources of the custodial parent;
>
> "(3) The standard of living the child would have enjoyed had the marriage not been dissolved;
>
> "(4) The physical and emotional condition of the child and his or her educational needs; and
>
> "(5) The financial resources and needs of the non-custodial parent."

Moreover, Family Court Administrative Order No. 12-05, which governs when and how the child support guidelines shall be used by the Family Court, provides a definition of monthly gross income. That definition states, in pertinent part:

> "For purposes of these Guidelines, 'income' is defined as actual gross income of the parent, if employed to full capacity or potential income if unemployed or underemployed. Gross income includes, but is not limited to, income from salaries, wages, commissions, bonuses, dividends, severance pay, pensions, interests, trust income, annuities, capital gains, social security benefits, worker's compensation benefits, unemployment insurance benefits, disability insurance benefits, gifts, prizes, and alimony or maintenance received, and all other forms of earned/unearned income. Specifically excluded are benefits received from means-tested public assistance programs * * *.

> "For income from self-employment, rents, royalties, proprietorship of a business, or joint ownership of a partnership or closely held corporation, gross income is defined as gross receipts minus ordinary and necessary expenses required for self-employment or business operation. In general, income and expenses from self-employment or operation of a business should be carefully reviewed to determine an appropriate level of gross income available to the parent to satisfy a child support obligation. In some instances, this amount will differ from a determination of business income for income tax purposes.

> "Expense reimbursements or in-kind payments received by a parent in the course of the employment, self-employment, or operation of a business should be counted as income if they are significant and reduce personal living expenses." (Footnotes omitted.)

"We consistently have stated that 'the guiding principle in setting a child-support award is to balance the needs of the child against the financial ability of the absent parent.'" *Tamayo*, 15 A.3d at 1036 (brackets omitted) (quoting *Paradiso v. Paradiso*, 122 R.I. 1, 3, 404 A.2d 60, 61 (1979)). "A court may consider all relevant factors, including the financial resources and needs of the child and each of the parents and the Family Court may consider every factor that would serve to reveal in totality the circumstances and conditions bearing on the welfare of the

children." *Id.* (brackets and deletion omitted) (quoting *Sullivan v. Sullivan*, 460 A.2d 1248, 1250 (R.I. 1983)). "This Court defines a parent's ability to pay very broadly, to 'provide the child or children with the greatest possible support.'" *Id.* (quoting *Lembo v. Lembo*, 624 A.2d 1089, 1090 (R.I. 1993)).

We first note that, upon cursory review, the child support guidelines appear to require that all sources of income, whether earned or unearned, should be included in a parent's gross income for purposes of calculating child support. However, with respect to "income and expenses from * * * operation of a business[,]" the administrative order clarifies that the trial justice must conduct a "careful[] review" of the income and expenses of a business "to determine an appropriate level of gross income available to the parent to satisfy a child support obligation." The trial justice in this case was therefore required to conduct a careful review of Century's income and expenses that passed through to Joel. *See Tamayo*, 15 A.3d at 1037.

In *Tamayo*, we held that the trial court's determination of a father's gross income was insufficient because the trial justice should have included the father's National Guard pay and income from rental properties in his assessment. *Tamayo*, 15 A.3d at 1036, 1037. This was so because the trial justice overlooked an abundance of evidence and testimony on those items. *Id.* at 1037. Instead, the trial justice in that case relied solely on what was reported on the father's income tax return, which did not include some of the father's National Guard income and income derived from his rental properties. *Id.* at 1036-37. Here, although Century's 2015 net income and distributions were included on Joel's income tax return, the trial justice looked beyond that document and considered the abundance of testimony from Mr. Amico to find that Century's net income and distributions to Joel should *not* have been included as a part of Joel's gross income calculation. We are therefore satisfied that the trial justice conducted a "careful[] review" as

required by the child support guidelines and our holding in *Tamayo*. *See id.* at 1037. Thus, we must determine only whether the conclusions that the trial justice drew after such a review were clearly wrong. *See id.* at 1035.

On appeal, Denise argues that the trial justice erroneously excluded Century's 2015 net income from Joel's gross income. She also claims that distributions made in 2015 from the S corporation to Joel were used to pay for his personal income taxes, sole ownership in Century, and personal expenses, including a personal life insurance premium. We shall address each of those arguments below.

**1**

**Century's 2015 Net Income**

Denise argues that, because Joel is the sole shareholder of Century, 100 percent of Century's 2015 net income should be attributable to Joel for the purposes of calculating his child support obligation. She contends, therefore, that the trial justice erred when he found that the S corporation's net income should not be included in Joel's gross income, even though it was included on his W-2 form. According to the trial justice, those funds were retained by Century for a legitimate business purpose in order to meet the working capital threshold set by Century's bonding company. Denise points out to this Court that nowhere in the child support guidelines' inclusive definition of gross income is there a "legitimate business purpose" exception for corporate profits.

In his decision, the trial justice relied heavily on *J.S. v. C.C.*, 912 N.E.2d 933 (Mass. 2009), a decision rendered by the Massachusetts Supreme Judicial Court. In that case, a father appealed a child support judgment, arguing that the trial judge erroneously included undistributed earnings of a closely held S corporation—of which he was a majority

shareholder—in calculating his gross income with respect to his child support obligation. *J.S.*, 912 N.E.2d at 940. He argued that the "pass-through earnings" from the S corporation on his income tax return should not have been included because those earnings "were likely to be retained by the corporation rather than distributed to him." *Id.* at 941.

In *J.S.*, the Supreme Judicial Court took note of new guidelines that had been adopted in Massachusetts since that case commenced; those new guidelines contain the very same definition of gross income as do our current child support guidelines.[11] The court reasoned:

> "The New Guidelines thus suggest that, when setting child support, the judge should determine the income of an S corporation shareholder not by including automatically the pass-through income reported on the shareholder's tax return, but rather by making a specific determination about what portion (if any) of that pass-through income *realistically and fairly is or should be deemed available to the shareholder for purposes of paying child support.*" *J.S.*, 912 N.E.2d at 941 n.13 (emphasis added).

Recognizing that other jurisdictions had grappled with this same issue of whether retained earnings should be included as gross income for the purposes of calculating child support, the court held:

> "[T]he better reasoned decisions require a case-specific, factual inquiry and determination * * *.
>
> "We follow the lead of these cases, and similarly conclude that a determination whether and to what extent the undistributed earnings of an S corporation should be deemed available income to meet a child support obligation must be made based on the particular circumstances presented in each case. Such a fact-based inquiry is necessary to balance, inter alia, the considerations that a well-managed corporation may be required to retain a portion of its earnings to maintain corporate operations and survive fluctuations

---

[11] Denise argues that the trial justice erred in relying on *J.S. v. C.C.*, 912 N.E.2d 933 (Mass. 2009), because it relied on a prior version of the Massachusetts guidelines. We disagree. Although the Supreme Judicial Court recognized that new guidelines had been adopted since that case commenced, the court expressly noted that its reasoning was in line with the new guidelines. *See J.S.*, 912 N.E.2d at 941 n.13, 942.

in income, but corporate structures should not be used to shield available income that could and should serve as available sources of child support funds." *J.S.*, 912 N.E.2d at 942.

The court then delineated relevant factors that a trial justice should consider in determining what portion of undistributed earnings may be available to a shareholder for a child support obligation. *J.S.*, 912 N.E.2d at 942-43. Those factors included: (1) "the shareholder's level of control over corporate distributions" as measured by his or her ownership interest; (2) "the legitimate business interests justifying" the decision to retain corporate earnings—if the purpose was to maintain the business, the Court concluded that those earnings should not be included in gross income; and (3) whether there was "affirmative evidence of an attempt to shield income by means of retained earnings." *Id.* at 942-43, 943 n.15. The court further held that the shareholder, regardless of his or her ownership interest, has the burden of proving that retaining the corporation's earnings was for a legitimate business purpose because he or she has greater access to relevant information about the corporation. *Id.* at 943-44. After determining that the trial court had not given any specific consideration to any particular facts or circumstances in ruling that all of the corporation's income should be attributed to the father, the Supreme Judicial Court remanded the case for a new decision that would be in line with its opinion. *Id.* at 944.

We are persuaded by the reasoning set forth in *J.S.*, and observe that the reasoning in that case emanates from a definition of gross income that mirrors our own. The reasoning in that case is instructive in determining whether undistributed pass-through earnings from an S corporation should be attributable to a shareholder's gross income for calculating child support. *See J.S.*, 912 N.E.2d at 942, 943, 944; *see also Tuckman v. Tuckman*, 61 A.3d 449, 458 (Conn. 2013) (citing with approval *J.S.* and incorporating its factors in determining whether pass-

through income from an S corporation should be available for child support purposes). Here, the trial justice examined the relevant factors set forth in *J.S.* and applied them to this case. He determined that Joel was the sole shareholder of Century and that "all evidence demonstrated that Century Drywall's retained earnings had been used for legitimate business reasons in the past and were in no way used to shield or manipulate [Joel's] income to reduce or avoid his child support obligation." He further opined that, according to Mr. Amico's testimony, Century had capitalization issues and that the company was required to retain its earnings to maintain sufficient working capital, as required by its bonding company. The court then concluded that, based on Mr. Amico's uncontradicted testimony, which the trial justice found to be "very informative and quite credible," the decision to retain earnings "was certainly a legitimate business purpose."[12] We conclude that the trial justice acted within his discretion in applying a "legitimate business purpose" analysis to find that Century's retained earnings should not be included in Joel's gross income for the purposes of determining his child support obligation.

Denise further argues that the trial court "misconceived and overvalued [Mr.] Amico's testimony, ignoring more credible evidence" in the process of conducting the legitimate business purpose test outlined above. Specifically, she claims that, in May 2015, Century's bonding company advised Century that it needed to maintain $7 million in working capital for 2015, and that it was not until May 2016 that the bonding company increased the minimum retention requirement to $10 million. Denise also points out that Mr. Amico testified that Century's net worth increased to $8,361,919, which, according to Denise, means that Century actually exceeded its retention requirement in 2015 by $1,361,919. Thus, she contends, it was error for

---

[12] We note that, at the September 2016 hearing on child support, Denise never called any witnesses to contradict Mr. Amico's testimony.

the trial justice to even consider the decision to retain net income as a legitimate business purpose when Century had already met its retention requirements for 2015.

During the divorce trial, in April 2016, Joel testified that Century was required to hold $7 million in equity. A month later, Mr. Amico elaborated that the amount that the bonding company required Century to hold in equity was ten percent of the total sales revenue of the corporation. He further testified that, because Century was in such a volatile industry, the company's business was subject to fluctuation and, thus, "the equity target can be a moving number." In fact, Mr. Amico later testified in September 2016 that the minimum bonding requirement that Century was required to hold in equity reserves increased to $10 million. He also said that the corporation was undercapitalized and that, as a result, the company could be denied the ability to obtain bonding for future projects if it failed to raise its equity.

With respect to whether Century's 2015 net income was properly excluded from Joel's gross income calculation, we are of the opinion that the trial justice did not abuse his discretion. Although there was evidence indicating that, at some point in 2015, the corporation was required to hold at least $7 million in equity and that, by the end of 2015, the corporation exceeded that amount by $1,361,919, Mr. Amico was clear in his testimony that the bond requirement was not static and that the figure was completely dependent on the company's total sales revenue, which was subject to considerable fluctuation in the construction industry. Indeed, according to the testimony, Century's minimum bonding requirement rose from $7 million to $10 million over a two year period. For all those reasons, we see no error in the ruling of the trial justice to exclude

Century's undistributed pass-through income from Joel's gross income for calculating his child support obligation.[13]

**2**

**2015 Distribution for Taxes**

Denise also argues that the trial justice erroneously excluded from Joel's gross income a distribution of $1,235,846 that Joel used to pay his "personal" income taxes. She alleges that the Family Court must determine an appropriate level of gross income available to a parent to satisfy a child support obligation, and that gross income necessarily would include nontaxable portions owed or deducted as personal income tax liability. She further contends that nothing in the child support guidelines suggests that income must inure to one's benefit or be actually received by a parent to be included as income, because the child support guidelines require that all sources of earned or unearned income be considered.

However, there was evidence presented at trial that this distribution was used to pay taxes on the pass-through income that Joel received from Century. "Courts in several jurisdictions have held that the portion of a distribution designated to pay taxes on earnings legitimately retained by the corporation is not available to a shareholder parent to satisfy a child support obligation." *J.S.*, 912 N.E.2d at 944 n.18 (citing *McHugh v. McHugh*, 702 So.2d 639, 642 (Fla.

---

[13] Denise additionally argues that the trial justice's reliance on *Hubbard County Health and Human Services v. Zacher*, 742 N.W.2d 223 (Minn. Ct. App. 2007), was in error because that case had been deemed inapposite by the Minnesota Supreme Court in *Haefele v. Haefele*, 837 N.W.2d 703 (Minn. 2013). Although we note that *Haefele* did rule most of the *Zacher* opinion inapposite, the trial justice in the case before us relied on *Zacher* for the proposition that a parent's ownership interest in an S corporation could be a resource that should be taken into consideration in determining his or her ability to pay child support. *Haefele* did not deem this portion of the *Zacher* opinion inapposite; in fact, *Haefele* supported that proposition at the end of its opinion. *See Haefele*, 837 N.W.2d at 714 ("[T]he district court [is allowed] to consider, among other things, the extent to which the parent's gross income is actually *available* to him or her to pay support.") (emphasis in original). Therefore, the trial justice's reliance on *Zacher* for considering Joel's ability to pay was not in error.

Dist. Ct. App. 1997); *Tebbe v. Tebbe*, 815 N.E.2d 180, 184 (Ind. Ct. App. 2004); *Walker v. Grow*, 907 A.2d 255, 270 (Md. Ct. App. Spec. 2006)). As previously discussed above, the pass-through income that Joel received and on which he paid taxes was actually retained by the corporation for a legitimate business purpose and was not distributed to him. The trial justice found that that income was not available to Joel and that it did not inure to his benefit. We agree, and therefore hold that the trial justice correctly excluded Century's distribution to Joel that was used to pay the company's tax liabilities.[14]

**3**

**2015 Distribution for Stock Buyouts**

Denise next argues that the trial court failed to quantify and erroneously excluded distributions used by Joel to buy out his partners and acquire sole ownership interest in Century. According to Denise, those distributions were used to pay what were essentially Joel's personal debts to his former partners. To support this claim, Denise points to Joel's testimony that he incurred a "personal debt" in the buyout, that he was paying down debt to acquire a marital asset, and that Century itself was not obligated on the note. Denise also notes that Mr. Amico testified that the buyout debts were "outside the business" and enhanced the value of the marital estate.

We agree with Denise and hold that distributions used by Joel to satisfy his personal obligation in purchasing the sole ownership in Century should have been included in his gross income calculation to determine his child support obligation. Joel testified that, on January 1,

---

[14] Denise alleges in her brief that the parties confirmed at trial that Joel paid $1,082,544 in personal taxes in 2015, not $1,235,846, and that therefore, the trial justice did not conduct a "careful review" as required by the child support guidelines. Even if the amount was in error, this argument is a nonstarter because that distribution was to pay for the corporation's taxes, not Joel's personal taxes. For this reason, we reiterate what has been stated above: that none of the distribution, no matter the amount, should have been included in Joel's gross income to calculate his child support obligation.

2012, Mr. Elliott sold his shares of stock to Joel and John. According to Joel, Mr. Elliott's interest was purchased for $2.5 million, and John and Joel were equally obligated on the payment to Mr. Elliott; therefore, Joel's obligation to Mr. Elliott was $1.25 milion. Joel's obligation to Mr. Elliott was to be satisfied in two ways: by a $650,000 promissory note payable at four percent interest, with payments to be made quarterly for ten years, and a $600,000 one-time no-interest "balloon payment" due in 2021.

Joel further testified that, in December 2013, approximately two years after the agreement with Elliott, he purchased John's ownership in Century for $7.2 million, leaving Joel as the sole shareholder of the corporation. Joel testified that the obligation to John was too much for him to bear as a personal debt, so the brothers agreed that John would be paid in three ways. First, Joel assigned John his one-third membership interest in ARK Properties, LLC, a company owned jointly by Joel, John, and Mr. Elliott that had an ownership interest in multiple property investments. In their purchase and sale agreement, Joel and John valued Joel's interest in ARK at $2,890,691.[15] Second, Joel executed a promissory note to John in the amount of $3,425,931, with a ten year term, at four percent interest. Third, Joel assumed John's obligations for Mr. Elliott's buyout, which was valued at $883,378.

Joel testified that his obligation to both John and Mr. Elliott are obligations for which he "solely [is] personally liable[,]" and that Century is not liable in any way for the payments. Moreover, Joel signed the promissory notes in his personal capacity. Mr. Amico also testified that the buyouts were cross-purchases between shareholders, that Joel acted in his individual capacity in completing those transactions, and that Century did not owe Mr. Elliott or John any

---

[15] Joel testified that to complete the transaction, he also conveyed his interest in another company called JMJ, LLC. However, the stock purchase and sale agreement between Joel and John only mentioned Joel's interest in ARK as consideration for the sale.

moneys regarding the buyouts. Mr. Amico described the buyouts as Joel's "personal debt held out of convenience to perpetuate a succession plan to maximize surety credit."

Although we have acknowledged our well-settled rule that "a witness's uncontroverted, positive testimony ordinarily is conclusive upon the trier of fact[,]" nevertheless, we also have held "'that a trial justice may refuse to accept the uncontroverted testimony of proffered witnesses' under certain circumstances." *Pelletier v. Laureanno*, 46 A.3d 28, 39 (R.I. 2012) (quoting *Paradis v. Heritage Loan and Investment Company*, 701 A.2d 812, 813 (R.I. 1997) (mem.)). One of those circumstances is when positive uncontroverted testimony "contains inherent improbabilities or contradictions, which alone, or in connection with other circumstances, tend to contradict it." *Id.* (quoting *Laganiere v. Bonte Spinning Co., Inc.*, 103 R.I. 191, 194, 236 A.2d 256, 258 (1967)).

As noted above, in his bench decision, the trial justice found Mr. Amico's testimony to be uncontradicted and "very informative and quite credible[.]" There was, however, ample evidence presented that Joel was receiving money from Century to satisfy what are indisputably strictly personal obligations to the former shareholders. Joel himself testified that "[t]he [p]romissory [n]otes are held by just me * * * not the company." At the child support hearing on September 28, 2016, an Equity Rollforward Sheet, created by Mr. Amico, was entered as a full exhibit. Mr. Amico testified that the sheet detailed Century's stockholder equity from December 31, 2013, through December 31, 2015. The document also revealed that Century made distributions for John's buyout and Mr. Elliott's note payments in 2014, as well as note payments to Mr. Elliott and John in 2015. Mr. Amico further testified that those note payments were for the buyouts.

Also, during the trial, Joel testified that, when he received a distribution from Century, he would use that money to write a check to John and to Mr. Elliott to satisfy his obligations under the note payments. Furthermore, Mr. Amico testified that he knew that Joel was current on his payments to John and Mr. Elliott because, in addition to preparing his returns, he could "see the payments going through his distributions at the company level." Mr. Amico further testified that the distributions from Century that were reflected on the tax returns of Joel and Denise amounted to approximately $1.5 million, that Joel used the money from that distribution to satisfy his buyout obligation, and that, as a result of the acquisition of the company solely in Joel's name, the marital estate would be enhanced. The following exchange occurred during Mr. Amico's cross-examination:

> "[DENISE'S COUNSEL:] * * * Now, just to be clear, it's your testimony that for these distributions for payments that went to Michael Elliott and John Trojan, what would transpire is Century Drywall would cut a check personally to Joel Trojan; and it's your understanding and testimony that Joel Trojan would then deposit the check into his personal account and then cut out a check to Mike Elliott and John Trojan to pay this personal debt, is that correct?
>
> "[MR. AMICO:] Yes."

It is thus clear from the evidence that Joel's obligation to pay Mr. Elliott and John for the purchase of their stock in Century was personal in nature and that Joel used distributions from Century to meet that personal obligation. Importantly, at the September 28, 2016 hearing, Mr. Amico, when asked by the trial justice if he should include the distributions in Joel's gross income calculation, responded:

> "[MR. AMICO:] The distributions – if the goal is to maintain the same level of living – standard of living for this child, historically, the profits from Century Drywall have never been distributed to enhance the life-style. They've always been pretty much retained within the organization. So, factoring that into the equation would

- 27 -

significantly enhance her standard of living beyond what's been provided to date, based on my understanding of the company and the distribution history."

Based on the evidence presented to the trial justice, Mr. Amico was incorrect when he testified that "factoring [the note payment distribution] into the equation would significantly enhance [Tiffany's] standard of living beyond what's been provided to date[.]" Because the note payments are Joel's personal obligation, he would ordinarily pay them with his own money, i.e., his salary and interest payments he receives from the joint marital account. However, by using Century's funds to pay for his own personal obligation, Joel no longer is required to pay that debt with his own money. Tiffany's lifestyle therefore had already been enhanced when Joel received that distribution because the portion of his salary that would otherwise have been used to pay for his personal obligation to the former shareholders became available to Joel to be used for other purposes. The Family Court administrative order is clear: "gross income is defined as gross receipts minus ordinary and necessary expenses required for self-employment or business operation." Joel's purchase of John's and Mr. Elliott's shares was not an "ordinary and necessary expense[]" for Century. Rather, it was a personal obligation that Joel incurred to secure his sole ownership of the company. The distribution that Joel received from Century to pay for that personal debt he owes to John and Mr. Elliott with respect to their buyouts should therefore be considered when calculating Joel's gross income.

Although we acknowledge that the trial justice considered all relevant factors such as the needs of the child and each of the parents' financial resources, we nonetheless take this time to stress that "[t]his Court defines a parent's ability to pay very broadly, to 'provide the child or children with the greatest possible support.'" *Tamayo*, 15 A.3d at 1036 (quoting *Lembo*, 624 A.2d at 1090). Consequently, it is our opinion that the distributions that Joel received from

Century to satisfy the note payments to Mr. Elliott and John should have been considered to be part of Joel's gross income under the child support guidelines. It is for this reason that we hold that the trial justice erred when he excluded those moneys from Joel's gross income. We therefore remand this case for a hearing to consider and recalculate the assets and income available to satisfy the child support obligation.

**4**

**2015 Distribution for Life Insurance Premium and Other Personal Expenses**

Denise further argues that the trial justice erred when he excluded from Joel's gross income a $61,375 distribution from Century that Joel used to pay an annual premium on a personal life insurance policy that named his daughters as beneficiaries. She points out that Joel testified that he received distribution checks from Century, deposited them into his own personal account, and wrote personal checks to pay the premium. We agree with Denise's argument.

In our opinion, the distribution used to pay Joel's personal life insurance premium should have been considered to be gross income in the calculation for Joel's child support obligation. At trial, Joel testified that he purchased a life insurance policy and created an irrevocable trust, under which his two daughters are beneficiaries. He said that he funded the trust in that manner so that, in the event of his death, the policy would protect his daughters from having to pay his estate taxes. He further testified that, upon his passing, the policy benefit of $5 million would be deposited into that trust account. According to Joel, the annual premium on that life insurance policy is $61,375, and his brother, John, is the trustee of the irrevocable trust. On cross-examination, Joel testified as follows:

> "[DENISE'S COUNSEL:] So, basically, you take a distribution for this amount from Century Drywall, and you cut a check to your brother John so he can make the [life insurance] payment, is that accurate?

"[JOEL:] Yes."

Mr. Amico also confirmed at the September 28, 2016 child support hearing that the Equity Rollforward Sheet indicated that Century made a distribution to Joel "for life insurance for his trust." In our opinion, the money distributed to Joel to fund the life insurance premium should have been included as gross income because that distribution was used to satisfy a personal debt that Joel chose to take on himself. *See Tamayo*, 15 A.3d at 1036. There was no evidence introduced at trial that payment of Joel's insurance premium was an "ordinary and necessary expense" of Century.

Denise also avers that the Family Court erred in excluding certain other "substantial financial perks" Joel enjoyed, including luxury automobiles, car insurance, gasoline, country club memberships, cell phones, and other expenses that he financed through distributions from Century. She argues that the trial justice allowed extensive testimony that Denise used marital assets to pay her legal fees, but precluded evidence on whether Joel did the same. Denise further claims that the trial justice should have considered that Century had access to an $8 million line of credit.

The record reflects that evidence of those "perks" was presented to the Family Court during the divorce trial to calculate the marital estate. Eventually, a marital settlement agreement was entered into by the parties which resolved any issues outstanding with respect to the marital estate. In fact, the only issue remaining after the Family Court approved the marital settlement agreement was "child support and medical[.]" It is our opinion that Denise was therefore required to present that evidence again at the September 28, 2016 hearing in order to calculate Joel's child support obligation. No such evidence of "substantial financial perks," legal fees, or Century's line of credit was presented to the trial justice at the child support hearing, nor does the

record reflect that Denise's counsel directed the court to prior testimony of that evidence for purposes of calculating child support. The only distributions that Denise's counsel raised at the child support hearing were distributions amounting to $1,641,150 in 2015, which, according to Mr. Amico's testimony and the Equity Rollforward Sheet, included distributions made by Century to Joel to pay for taxes on the corporation's income, the notes payable to the former shareholders, and Joel's life insurance premium. We therefore hold that, because the "substantial financial perks," legal fees, and line of credit were not properly raised at the child support hearing on September 28, 2016, Denise's argument that the trial justice erred when he did not consider those expenditures in calculating Joel's gross income for child support purposes has been waived on appeal in accordance with our well-established raise-or-waive rule.[16] *See Adams*, 183 A.3d at 548.

## IV

## Conclusion

For the foregoing reasons, we affirm in part and vacate in part the judgment entered by the Family Court. The record shall be remanded to that tribunal for further proceedings in accordance with this opinion. We direct the trial justice to conduct a hearing in which he shall

---

[16] Denise also briefly argues in her memorandum to this Court that the trial justice erred when he allocated future income from her share of the marital estate to her gross income. The trial justice determined that Denise could expect to receive a three percent rate of return on the portion of the marital estate that she received, and he employed that rate of return as her gross income for the purpose of calculating her child support obligation. However, Denise does not cite to any authorities for support and thus that argument does not merit our consideration. We have consistently held that, "under our raise-or-waive rule, 'even when a party has properly preserved its alleged error of law in the lower court, a failure to raise and develop it in its briefs constitutes a waiver of that issue on appeal and in proceedings on remand.'" *Terzian v. Lombardi*, 180 A.3d 555, 557 (R.I. 2018) (brackets omitted) (quoting *McGarry v. Pielech*, 108 A.3d 998, 1005 (R.I. 2015)). Moreover, "we will not give life to arguments that [a party] has failed to develop on his [or her] own." *Id.* at 558 (quoting *McMahon v. Deutsche Bank National Trust Co.*, 131 A.3d 175, 176 (R.I. 2016) (mem.)). We therefore have no other choice but to find that that argument has been waived.

consider and recalculate the assets available to satisfy Joel's child support obligation. However, we note that, after the trial justice includes the stock buyout distribution and insurance premium as part of Joel's gross income, the trial justice "may then deviate from the worksheet guidelines 'only if he or she finds that the recommended child support order would be inequitable to the child or to either parent.'" *Vieira*, 150 A.3d at 618 (brackets and deletion omitted) (quoting *Cardinale*, 889 A.2d at 221). We also reiterate that the child support order must reflect "an amount reasonable or necessary for the child's support[.]" Section 15-5-16.2(a).

# STATE OF RHODE ISLAND AND PROVIDENCE PLANTATIONS

## SUPREME COURT – CLERK'S OFFICE

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | Joel Trojan v. Denise Trojan. |
| **Case Number** | No. 2017-123-Appeal. <br> (P 14-484) |
| **Date Opinion Filed** | June 3, 2019 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Family Court |
| **Judicial Officer From Lower Court** | Associate Justice John E. McCann, III |
| **Attorney(s) on Appeal** | For Plaintiff: <br><br> Laura E. Ruzzo, Esq. <br> Jerry L. McIntyre, Esq. |
| | For Defendant: <br><br> Patrick O'Connor, Esq. |